## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 19 2020, 8:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna K. Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Robert J. Henke
Abigail Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

L.W. (Minor Child),

And

M.W. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

May 19, 2020

Court of Appeals Case No.
20A-JC-31

Appeal from the Decatur Circuit Court

The Honorable Timothy Day, Judge

Trial Court Cause No.
16C01-1909-JC-321

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, M.W. (Father), appeals the trial court's adjudication of his minor child, L.W. (Child), as a Child in Need of Services (CHINS).

We affirm.

# ISSUE

Father presents this court with three issues on appeal, which we restate as: Whether the trial court erred by adjudicating Child to be a CHINS.

# FACTS AND PROCEDURAL HISTORY

Mother and Father are the biological parents to Child, born on April 13, 2011.[1] While Child resided with both parents, Father had physical custody of the Child. On September 8, 2019, Westport Police Department officer Tony Blodgett (Officer Blodgett), was dispatched to a domestic violence incident at parents' home. Upon arrival, Officer Blodgett observed Mother "bleeding from her nose, sobbing, [and] crying uncontrollably." (Transcript p. 29). Mother told the officer that she and Father "had gotten in an argument over money, and that they had gotten up and . . . bump[ed] chests together. And he had then spit in her face. He had hit her and bent her backward over the top of the countertop; was choking her to the point where she felt like she was going to lose consciousness, and had taken a frying pan and hit it on the countertop so

---

[1] Mother does not participate in this appeal.

badly that it had bent the frying pan almost in half." (Tr. pp. 29-30). Child was in the home at the time of the altercation. Officer Blodgett spoke with Father, who had left the home with Child by the time the officer arrived, over the telephone. Father advised the officer that Mother had assaulted him. He described Mother "head-butt[ing]" him and that "any marks that she had on her, she would have done herself." (Tr. pp. 38-39). Father refused to go to the police station so that Officer Blodgett could gather evidence supporting Father's statement. Upon further investigation, Officer Blodgett was informed by Bartholomew County law enforcement officers that they had responded to prior domestic violence incidents at parents' home.

[5] The Department of Child Services (DCS) became involved with the family on September 17, 2019, when the trial court authorized the emergency removal of the Child from her parents' care after Father "abscond[ed] with the [C]hild to elude law enforcement with regard to [] domestic violence" that occurred in the home, and due to Mother's history of drug abuse and "deplorable home conditions." (Appellant's App. Vol. II, pp. 13-14). That same day, DCS filed its CHINS petition and an initial hearing was held during which Mother admitted the allegations and Father entered a denial. Two days later, on September 19, 2019, DCS filed an amended CHINS petition, alleging that the Child had been exposed to domestic violence by Father against Mother. As a result, Father had been charged with criminal confinement, domestic battery resulting in bodily injury, and domestic battery against Mother. DCS located the Child in Bartholomew County where Father had placed her after fleeing

from law enforcement officers when the domestic violence incident occurred. Child was dirty, wearing dirty clothes, and had dog feces caked on the soles of her feet.

[6] On November 14, 2019, the trial court conducted a fact-finding hearing. At the hearing, Mother characterized the incident as "an argument" and a "disagreement." (Tr. p. 46). She recanted her previous statement in which she pointed to Father as the initial aggressor, stating that she could not remember Father using violence against her, but instead she remembers "flipping out my own self because I thought he was – in my head I was thinking he was going to take my child." (Tr. p. 46). Mother denied sustaining any injuries during the incident.

[7] Father denied any domestic violence issues existed between him and Mother. He testified that during the incident on September 8, 2019, Mother "jumped up and started screaming and acting crazy" so he grabbed "a pan and beat it on the counter trying to get her to shut up." (Tr. p. 81). Father described Mother "grabb[ing] [him] by the neck and [he] had a big cut." (Tr. p. 86). Father took Child and left the residence. As a result of the incident, the State charged Father with three felonies, which were pending at the time of the fact-finding hearing, and the criminal court imposed a no-contact order between Mother and Father.

[8] At the hearing, Father confirmed Mother's substance abuse issues, describing her as a "monster" when she is using. (Tr. p. 80). He testified that at the time

of the incident, Mother was taking "Klonopin and then whatever the neighbor lady gave her." (Tr. p. 80). Mother informed the trial court that she was receiving treatment through the Indiana Treatment Center, she was enrolled in counseling twice a month, and she was receiving methadone treatment for substance abuse issues. Although Mother and Father were living apart due to the no-contact order, Mother admitted that she would be staying with Father absent the order.

[9] DCS's Family Case Manager (FCM) testified that Mother described Father as "controlling" which caused the FCM concern that Mother had recanted her statement about the domestic violence incident under Father's pressure. (Tr. p. 61). The FCM also informed the trial court that it is concerning that when Mother is prescribed medication by her doctors, she appears to decide whether she will continue to take the medication. At the hearing, the FCM was also unaware of Mother receiving substance abuse treatment.

[10] At the close of the fact-finding hearing, the trial court found the allegations of the CHINS petition to be true and adjudicated the Child to be a CHINS. The court ordered both parents to participate in services and, concluding that the Child's detention was no longer necessary, ordered Child placed into Father's care. On January 3, 2020, after a dispositional hearing, the trial court ordered Father, in pertinent part, to submit to random drug screens, to refrain from engaging in acts of domestic violence, and to participate in and complete all recommendations as a result of the domestic violence assessment.

Father now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

Father contends that the trial court abused its discretion in finding Child to be a CHINS. In order to adjudicate a child as a CHINS, DCS must prove by a preponderance of the evidence that:

> (1) The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) The child needs care, treatment or rehabilitation that:
>
> > (A)     The child is not receiving; and
> >
> > (B)     Is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-1. In making its determination, the trial court should consider the family's condition not just when the case was filed, but also when it was heard. *In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014). A CHINS adjudication cannot be based solely on conditions that have ceased to exist. *In re S.A.*, 15 N.E.3d 602, 6011 (Ind. Ct. App. 2014), *trans. denied*. The adjudication must be based on the evidence presented in court and not on the allegations in the pleadings. *Maybaum v. Putnam Co. O.F.C.,* 723 N.E.2d 951, 954 (Ind. Ct. App. 2000). In reviewing a CHINS determination, we do not reweigh evidence or

assess witness credibility. *Matter of N.C.*, 72 N.E.3d 519, 523 (Ind. Ct. App. 2017). We consider only the evidence in favor of the trial court's judgment, along with any reasonable inferences arising therefrom. *Id.*

[13] Father maintains that the trial court erred in adjudicating Child to be a CHINS because there was no evidence Child was in any danger, or that her needs would go unmet in the absence of the coercive intervention by the trial court. The purpose of a CHINS inquiry is to determine whether a child's circumstances require services that are unlikely to be provided without the intervention of the court, and thus, the focus of a CHINS adjudication is on the condition of the child alone, not on the culpability of one or both parents. *In re N.E.*, 919 N.E.2d 102, 105-06 (Ind. 2010). Nonetheless, "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *In re S.D.,* 2 N.E.3d at 1287. Rather, a CHINS adjudication under Indiana code section 31-34-1-1 requires proof of three basic elements: the parent's actions or inactions have seriously endangered the child; the child's needs are unmet; and "perhaps most critically," those needs are unlikely to be met unless the State intervenes. *Id.* It is the last element that guards against unwarranted State interference in family life. *Id.* State intrusion is warranted only when parents lack the ability to provide for their children. *Id.* In other words, the focus is on the best interests of the child and whether the child needs help that the parent will not be willing or able to provide. *Id.* Despite a "certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS

adjudication is simply that—a determination that a child is in need of services. *In re N.E.*, 919 N.E.2d at 105.

[14]     In support of his argument that a CHINS adjudication was an abuse of discretion, Father relies on *A.M. v. Ind. Dep't of Child Servs.*, 45 N.E.3d 1252 (Ind. Ct. App. 2015) and *M.W. v. Ind. Dep't of Child Servs.*, 119 N.E.3d 165 (Ind. Ct. App. 2019).  However, upon review, we find both cases inapposite to the situation at hand.  In *A.M.,* the only evidence presented by DCS to support its CHINS petition was a positive meconium test at the time of A.M.'s birth. *A.M.*, 45 N.E.3d at 1255-56.  Based on the lack of any further evidence, we declined to find evidence of endangerment.  *Id.*  In *M.W.*, DCS became involved after Mother called law enforcement when her two teenage daughters got into a physical fight.  *M.W.*, 119 N.E.3d at 166-67.  The evidence reflected that, leading up to the CHINS hearing, mother voluntarily participated in services, was enrolled in counseling, and had set up therapy sessions for both daughters.  *Id*. at 169.  Mother also agreed the child needed therapy and intended to continue providing it.  *Id*.  Finding itself "stunned that the juvenile court found [c]hild to be a CHINS," this court reversed the CHINS adjudication as "[f]rom the outset, by calling the police, [m]other showed that she simply needed some help—and she got it, through the services provided by DCS.  By the time of the CHINS hearing, it was readily apparent that the child was not seriously endangered, and even more critically, that the coercive intervention of the court was not required."  *Id.*

[15]     Here, the circumstances demand a different outcome than in *A.M.* and *M.W.* At the time of the fact-finding hearing, neither Mother nor Father would admit that a domestic violence issue existed, despite their prior history. Mother recanted her initial story that Father was the aggressor and insisted that she could no longer remember the incident, characterizing it as a disagreement and argument despite telling Officer Blodgett that Father choked her to the point where she almost lost consciousness. Father, in turn, blamed Mother and said that she had harmed him. The trial court found that "Child has been exposed to domestic violence by Father against Mother." (Appellant's App. Vol. II, p. 34). Yet, regardless of who the aggressor was, a problem of domestic violence exists in the home which neither parent acknowledged. Officer Blodgett elaborated that the family had a history of domestic violence issues and Mother testified that without the no-contact order in place, the parties would be living as a family again. As we have frequently recognized, a Child's exposure to domestic violence can support a CHINS finding. *In re N.E.,* 919 N.E.2d at 105.

[16]     It appeared that the instant incident of domestic violence was brought on by Mother's substance abuse as she had taken "Klonopin and then whatever the neighbor lady gave her." (Tr. p. 80). At the hearing, Father minimalized Mother's addiction and abuse of her medication. Father does not believe Mother needs services, instead informing the court that "[s]he's made a mistake. She's corrected. She's sober today." (Tr. p. 87). Although Mother advised the trial court that she has sought treatment for her addiction, she had yet to provide any proof of this to the FCM.

Recognizing that a CHINS determination is not a finding of guilt for either parent, but rather a vehicle to ensure the safety of the child, we conclude that parents' actions have seriously endangered the Child and without coercive intervention of the court, the Child will not receive the care she needs. Neither Father nor Mother acknowledged the domestic violence in the house, instead they downplayed it as an argument. Father minimalized the substance abuse by Mother, and merely regarded her abuse as a mistake. The Child needs a home environment that is stable and free of domestic violence and substance abuse. The coercive intervention of the court is required to accomplish this goal as parents were only living separately due to the no-contact order in place and Father, although ordered to participate in a domestic violence assessment, denied domestic violence was present in the home and actively challenged DCS's request to order Father to participate in the Batterers Intervention Program Assessment. Accordingly, the trial court did not abuse its discretion by adjudicating Child to be a CHINS.

# CONCLUSION

Based on the foregoing, we hold that the trial court properly adjudicated Child to be a CHINS.

Affirmed.

Mathias, J. and Tavitas, J. concur